IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.  No. 4:25-CR-111-O

CHANTAL LYDIA SWART (01)

## FACTUAL RESUME

I. <u>Plea to Count One of the Second Amended Information</u>:
Count One: Conspiracy to Violate the Anti-Kickback Statute in violation of 18 U.S.C. § 371.

II. <u>Penalties</u>:
The penalties the Court can impose include:
a. imprisonment for a period not more than five (5) years;

b. a fine not to exceed $250,000, or twice the pecuniary gain or twice the pecuniary loss to any victim, or both a fine and imprisonment;

c. a term of supervised release of not more than three (3) years, which may be mandatory under the law and will follow any term of imprisonment. If the defendant violates the conditions of supervised release, the defendant could be imprisoned for an additional period of confinement;

d. a mandatory special assessment of $100; and

e. restitution to victims or to the community, which may be mandatory under the law, and which the defendant agrees may include restitution arising from all relevant conduct, not limited to that arising from the offense of conviction alone.

III. Essential Elements of the Offense:

The elements that must be proved beyond a reasonable doubt to establish the offense alleged in Count One include:

First: That the defendant and at least one other person agreed to violate the healthcare Anti-kickback Statute, as charged in the Information.

Second: That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

Third: That at least one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Information, in order to accomplish some object or purpose of the conspiracy.

IV. Stipulated Facts:

Beginning in or about April 2022, and continuing to in or about October 2022, in the Fort Worth Division of the Northern District of Texas and elsewhere, the defendant, Chantal Lydia Swart, and others, both known and unknown to the United States Attorney, did knowingly and willfully conspire and agree with each other and others to commit certain offenses against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks, in return for the referral of an individual to another person for the furnishing and arranging for the furnishing of items and services, namely genetic tests, for which payment was made in whole or in part under a Federal health care program, namely, Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(A), all in violation of 18 U.S.C. §371.

The defendant, Chantal Swart together with two others, owned and operated an entity, known as "Premier 1 Labs, LLC" ("Premier 1") which was located in Southlake, Texas. These three owners equally owned Premier 1 and shared in the profits. Premier 1 was a clinical laboratory. Generally, at all times relevant, when a clinical laboratory submitted a claim for payment for genetic testing to the Center for Medicare and Medicaid Services (CMS), the laboratory had to identify the diagnosis codes associated with the need for the test.

The diagnosis codes were typically identified on a "requisition form," or doctor's order, which the enrolled, authorized medical provider signed to request the test from the laboratory. When a legitimate medical laboratory test was ordered, the medical professional would identify the diagnosis code(s) for the patient the provider was treating for a specific medical condition. The requisition form also identified the specific test the provider requested the laboratory to run. After the laboratory ran the specific test requested by the medical provider, the results were sent to the provider for the provider's use in the diagnosis and/or treatment of the patient/beneficiary.

As Swart knew, Premier 1 entered "marketing" contracts with entities that solicited beneficiaries to participate in genetic testing. As Swart knew, most often, these marketing companies used call centers staffed by non-medical employees to call beneficiaries to solicit them to participate in such testing. As Swart knew, sometimes, marketing companies solicited beneficiaries in person or through physician practices. Marketing employees or contractors who used call centers often used a "script" to ask the beneficiaries about their health. As Swart knew, Premier 1, through a billing company, trained the marketing companies as to which medical diagnosis codes (referred to as ICD-10 codes) would be "accepted" for the lab to run and submit a claim for payment for a genetic test. As Swart knew, the marketing companies or their call center contractors asked beneficiaries questions targeted at identifying specific symptoms or medical history generally associated with certain medical diagnoses. As Swart knew, the telemedicine companies sometimes populated the requisition form with the ICD-10 codes pre-identified and/or provided the medical information on which the physician (including telehealth providers) later relied to assign diagnosis codes.

As Swart knew, to obtain doctors' orders for the genetic tests, the marketing companies predominantly paid telehealth providers. The marketers were directed by Premier 1 to sign off on the requisition forms after an often relatively brief phone call with the beneficiary. As Swart knew, Premier 1 bought the referrals, including the genetic samples and associated signed doctors' orders, from the marketing companies, paying the companies based on the volume and value of the referrals. Premier 1 principals and representatives, including Swart, negotiated a specific rate per referral with each marketing company. To conceal the kickback arrangement, as Swart knew, Premier 1 entered into sham "flat fee" Marketing Business Service Agreements, which called for payment of a set amount on a monthly or annual basis.

As Swart knew, Premier 1 paid marketing companies only for "accepted" samples-that is, those samples that Premier 1's billing company identified as having "sufficient" and "correct" ICD-10 codes to justify the test.

As Swart knew, Premier 1 paid illegal kickbacks to marketing companies for beneficiaries' genetic samples and doctors' orders for genetic tests for which Premier 1 could bill Medicare.

The contracts provide for payment of a "flat fee" on an annual or monthly basis for "marketing services," including lead generation and management, inbound and outbound marketing services (receiving and handling incoming and outgoing telephone calls with customers), market research, intake and assessment services, and customer service. As Swart knew, these were sham contracts. The "services" performed were not as outlined in the contract, and instead consisted of solicitation of beneficiaries, often through call centers, to provide genetic samples, purchasing or otherwise obtaining doctors' orders to accompany the samples.  As Swart knew, payment from Premier 1 to the marketers was based on the volume and value of the referrals to Premier 1, not a "flat fee." Premier 1 officials, including Swart negotiated payment terms with the marketing companies based on the number of beneficiary samples with doctors' orders that each marketing company submitted, and that Premier 1 "accepted" (that is, those samples the company determined the insurance companies would pay for).

As specific examples and overt act of the conspiracy:
- On or about August 9 and 10, 2022, Swart submitted claims to Medicare for a beneficiary identified here as D.T. in the amount of $16,614.34. Medicare paid Swart's company $5,755.05 as a result of these claims. As Swart knew, these claims were fraudulent.
- On or about May 14, 2022, and June 24, 2022, Swart submitted claims to Medicare for a beneficiary identified here as M.S. in the amount of $32,880.00.  Medicare paid Swart's company $5,263.42 as a result of these claims. As Swart knew, these claims were fraudulent.
- On or about July 26, 2022, Swart submitted claims to Medicare for a beneficiary identified here as D.C. in the amount of $8,307.17. Medicare paid Swart's company $4,358.80 as a result of these claims. As Swart knew, these claims were fraudulent.
- On or about August 16, 2022, Swart submitted claims to Medicare for a beneficiary identified here as S.B. in the amount of $8,307.17. Medicare paid Swart's company $4,358.80 as a result of these claims. As Swart knew, these claims were fraudulent.

- On or about August 23, 2022, Swart submitted claims to Medicare for a beneficiary identified here as C.T. in the amount of $8,307.17 Medicare paid Swart's company $4,177.38 as a result of these claims. As Swart knew, these claims were fraudulent.

The defendant agrees that the defendant committed all the essential elements of the offense. This factual resume is not intended to be a complete account of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count One of the Information.

SIGNED on this 22nd day of May, 2025.

_____  
CHANTAL LYDIA SWART  
Defendant

_____  
RANDY S. CHARTASH  
Attorney for Defendant